2009 Ark. App. 110

**Vance B. ROLLINS, Jr., Appellant,**

v.

**STATE of Arkansas, Appellee.**

**No. CA CR 08–608.**

Court of Appeals of Arkansas.

Feb. 25, 2009.

Jack T. Lassiter, and Erin C. Couch, Little Rock, for appellant.

Dustin McDaniel, Att'y Gen., by: Leaann J. Irvin, Ass't Att'y Gen., Little Rock, for appellee.

LARRY D. VAUGHT, Chief Judge.

[1]Vance Rollins appeals his two manslaughter convictions that followed an automobile accident resulting in the deaths of Nina and Lawrence Humphrey. He raises several arguments, including insufficiency of evidence, erroneous denial of a motion in limine, and improper admission of evidence.[1] However, the essential question on appeal is whether the proof presented at trial established that Rollins was criminally reckless, a required element of the manslaughter offense. After a careful review of the record and relevant case law, we conclude that it does not. As such, we modify the judgment of conviction to the lesser-included[2] offense of negligent homi-

1. Rollins argues that the trial court erred in denying his motion in limine and admitting certain items into evidence, namely, the results of tests performed on his blood samples, three glass pipes found in his vehicle, and the green pills found at the scene. This question becomes moot based on our resolution of this case, which in no way relied on any of the challenged evidence mentioned.

cide and sentence Rollins to the maximum allowed by law on each count.

The trial testimony painted a clear picture of the events immediately preceding this tragic and fatal automobile accident, which claimed the lives of Mr. and Mrs. Humphrey. Just before the accident, Rollins tailgated a vehicle driven by O.J. Williams for approximately fifteen miles. Rollins also drove erratically, repeatedly coming up on Williams's bumper and then falling back a long distance when Williams slowed in hopes that Rollins would pass. Williams eventually pulled off the road at a CCC camp so that Rollins would pass him. Linda Brewer, who is a nurse, testified that she was traveling north on Highway 7 behind the Humphreys' vehicle at the time of the collision. She observed Rollins's vehicle in the oncoming lane of traffic. She noted that Rollins neither slowed nor swerved prior to the collision. Faith Miller, Ms. Brewer's daughter who was traveling with her, testified that, just prior to the collision, she saw Rollins look over his right shoulder.

Following the collision, Brewer and Miller exited their vehicle to render aid. Brewer assisted Rollins in his attempt to free his passenger from the wreckage. Later, Brewer observed Rollins walking and looking around. After she approached him, she saw him drop some green pills onto the ground. Brewer suggested that Rollins lie down; she saw green pills underneath him at one point after he raised up. Brewer collected several of these pills and tendered them to the police who arrived on the scene.

Trooper Greg McNeese with the Arkansas State Police testified that a Perry County sheriff's deputy gave him the green pills, which he placed in an envelope and secured in his vehicle. He also stated that he found a black bag in the front seat of Rollins's vehicle that contained clothes, toiletries, and a black case with three pipes in it. Christa Hall, a forensic chemist with the Arkansas State Crime Lab, testified that the green pills recovered at the scene were hydrocodone and acetaminophen and that the three pipes recovered from Rollins's vehicle tested positive for cocaine and procaine.

Becky Carlisle, a forensic toxicologist with the Arkansas State Crime Lab, testified that the blood samples taken from Rollins tested positive for a detectible amount of cocaine and sertraline, an antidepressant. However, she acknowledged that the blood sample contained less than .05 micrograms per milliliter, the minimum that will register when tested. Carlisle conceded that she could not accurately estimate how long the substances had been in Rollins's system prior to the collision or whether that level of cocaine in the blood would interfere in any way with his ability to function normally. Carlisle also confirmed that Rollins's blood sample did not contain hydrocodone or acetaminophen.

At the conclusion of the State's evidence, Rollins moved for a directed verdict, arguing that the State failed to provide substantial evidence of the element of recklessness. The trial court denied the motion, but agreed to instruct the jury on the lesser-included offense of negligent homicide. Ultimately, the jury found Rollins guilty on two counts of manslaughter and sentenced him to two consecutive four-year terms in the Arkansas Department of Correction.

■ We first address Rollins's argument that there was insufficient evidence to support his manslaughter convictions on the basis that there was no evidence that he acted recklessly. Rollins was charged with manslaughter pursuant to Ark.Code Ann. § 5–10–104(a)(3) (Repl. 2006), which provides that a person com-

mits manslaughter if he recklessly causes the death of another person. Arkansas Code Annotated § 5–2–202(3) (Repl.2006) provides:

A person acts recklessly with respect to attendant circumstances or a result of his conduct when he consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of a nature and degree that disregard thereof constitutes a gross deviation from the standard of care that a reasonable person would observe in the actor's situation.

Thus, the relevant inquiry is whether the evidence in the instant case demonstrated that Rollins consciously disregarded a substantial and unjustifiable risk.

The trial evidence established that Rollins was not intoxicated at the time of the accident. This is a closed question. At the time of the accident his system contained none of the substances found in the green pills that he attempted to hide immediately after the accident; he had less than a measurable amount of cocaine in his system; and the mere presence of an illegal substance in trace quantity does not amount to a per se showing of impairment. The fact that Rollins was neither intoxicated nor impaired was evidenced by the fact that the trial court did not instruct the jury on the felony version of negligent homicide, which contains the element of intoxication.

Despite the absence of proof relating to Rollins's drug-related impairment, the State did introduce proof that he tailgated, looked backward at the bend of a turn, crossed the center line, and drove erratically. Certainly, these acts are all careless, and in the aggregate they go beyond mere inattentiveness. However, in the context of our case law relating to the imposition of criminal liability for deaths caused by automobile accidents, we are convinced that Rollins's actions constitute negligence, not recklessness.

Our supreme court's analysis in *Hoyle v. State*, 371 Ark. 495, 268 S.W.3d 313 (2007), supports our conclusion. In this manslaughter case, the court thoroughly examined the threshold "recklessness" required to satisfy this element of the crime:

At trial, James Gann testified that he believed Hoyle almost ran another vehicle off the road, that Hoyle was extremely talkative at one point and then totally silent immediately prior to the accident, that Hoyle never braked immediately before striking the Dean motor home, and that Hoyle did not attempt to assist any of the victims at the scene of the accident. Trooper Adams testified that his investigation revealed that Hoyle's truck was originally traveling southbound, while the Dean vehicle was headed northbound, when Hoyle's vehicle crossed the center line and hit the Dean vehicle at a forty to forty-five degree angle. According to Corporal Adams, the impact of Hoyle's vehicle pushed the Dean vehicle backwards before Hoyle's vehicle went through the motor home. Adams also stated that while investigating the crash, he noticed Hoyle sitting by himself on a hill near the accident scene. This evidence coupled with the toxicology report that established that Hoyle had methamphetamine in his system at the time of the accident and Dr. Pappas's expert opinion that .221 micrograms per milliliter of methamphetamine without a doubt had a negative effect on the driving in this case clearly demonstrates that Hoyle acted recklessly in driving while under the influence of methamphetamine.

We simply do not agree that the jury had to resort to speculation or conjecture in order to conclude that the meth-

amphetamine in his system so altered his motor skills that it was the cause of the wreck. The foregoing evidence constituted substantial evidence that Hoyle recklessly caused the deaths of Hilda Dean and Gary Dean, in that he consciously disregarded a substantial and unjustifiable risk that death might occur if he operated a commercial vehicle after ingesting methamphetamine, and the disregard thereof constituted a gross deviation from the standard of care that a reasonable person would observe in Hoyle's situation.

*Id.* at 503–04, 268 S.W.3d 313, 319 (2007).

Unlike the facts presented in *Hoyle,* here, there was no testimony that Rollins seemed impaired or engaged in erratic behavior following the accident. And, there was no evidence that he was intoxicated. These two distinctions are crucial because, according to the holding in *Hoyle,* this is the type of "substantial" evidence required to support the reckless element of manslaughter when the charged death results from an automobile accident. The *Hoyle* case tells us that evidence of driving while intoxicated or impaired, or exhibiting extraordinarily erratic behavior, can be sufficient to show one has engaged in a conscious disregard of a substantial and unjustifiable risk that would cause death. However, absent such evidence, we cannot sustain a finding that Rollins was driving knowing that he could cause death, and by continuing to operate his vehicle, he evidenced a conscious disregard of that risk.

The State's evidence simply does not establish that Rollins *knew* that his actions—crossing the center line, tailgating, and averting his eyes from the road— presented a substantial and unjustifiable risk that he might hit a car traveling in the opposite direction and kill someone in that car and that he *consciously* disregarded that risk. However, in order to support

the lesser-included offense of misdemeanor negligent homicide, the proof must only show that Rollins *should* have been aware of that risk and his *failure to perceive that risk* constituted a gross deviation from the standard of care that a reasonable person would observe in the same situation.

Therefore, we engage in a secondary analysis to determine if the facts of this case can sustain a conviction for negligent homicide. The test for determining sufficient proof is whether there is substantial evidence to support the verdict. *Tigue v. State,* 319 Ark. 147, 889 S.W.2d 760 (1994). On appeal, we review the evidence in the light most favorable to the appellee and sustain the conviction if there is any substantial evidence to support it. *Id.* Evidence is substantial if it is of sufficient force and character to compel reasonable minds to reach a conclusion and pass beyond suspicion and conjecture. *Id.*

The proof of Rollins's negligence is ample, a conclusion that is supported by both the evidence and Rollins's own appeal argument. In fact, in *Utley v. State,* 366 Ark. 514, 237 S.W.3d 27 (2006), our supreme court held, over the strong dissent of our Chief Justice, that crossing the center line is negligence—almost negligence per se. And, in the context of our current case—where we are unable to conclude that as a matter-of-law Rollins's actions were reckless—we would be remiss if we failed to give at least some attention to the *Utley* dissent, where Chief Justice Hannah set out in persuasive language the difficulty in linking a criminally culpable mental state to a person who causes the death of another with an automobile. On this subject, and in the context not of recklessness, but of the lesser standard of negligence, Justice Hannah wrote:

Historically, liability for deaths in automobile accidents caused by common negligence have been resolved through civil

litigation. Where the death has resulted from mere negligence in driving, criminal liability has not been imposed. Where there was more than mere negligence, such as in the case of intoxication, high-speed [8]flight from police, or negligence that arises from a gross deviation from how a reasonably prudent person would act, criminal liability has been imposed over the course of many years. [Footnote omitted.] While wandering over the centerline is certainly very dangerous, it is an occurrence that, unfortunately, is commonly witnessed in everyday driving. Many dangerous actions that inattentive drivers engage in do not give rise to criminal liability.

It appears that this change results from a change in analysis. Where before the focus was on the culpable mental state of the driver, the focus now is upon the severity of the injury that results. This is at odds with accepted law on criminal liability.

Even though Utley has been convicted of negligent homicide, why he drove over the centerline remains entirely unknown. If under the circumstances, Utley should have been aware of the risk, and his failure to perceive it was a gross deviation from the care a reasonably prudent person would exercise under those circumstances, criminal liability might arise. *See, e.g., Hunter v. State,* 341 Ark. 665, 19 S.W.3d 607 (2000). However, we don't know the answer to this question because proof was lacking. We don't know what Utley perceived. No proof was offered. The State's argument is simply that there could be no reasonable excuse. The majority agrees. The State argues that "[d]riving requires constant attention, appropriate responsiveness, and reasonable capability." The facts of *Hunter* showed that Hunter knew what the road conditions were and still engaged in the affir-mative act of pulling out into an oncoming lane to pass a log truck, on a hill, in the rain, despite double yellow lines statutorily prohibiting passing, and despite the fact that the road spray produced by the log truck was so great he could not see. In *Hunter,* the proof showed that Hunter perceived and disregarded quite a number of dangerous conditions. All we know in the present case is that Utley pulled at least seven feet into the other lane, and we don't even know if it was an affirmative act. Even assuming it was inattention, mere inattention in driving has never been the basis of criminal liability until now.

The question that the majority opinion prompts is, are there any circumstances under which criminal liability would not arise if a person dies in an accident caused by a person who crosses the centerline? The answer is now "no." A person who causes the death of another person when he or she crosses the centerline is now strictly liable under the criminal law if the prosecuting attorney chooses to bring a criminal action. While there is ostensibly qualifying language in the majority opinion, that the truck in this case was a garbage truck, characterized as a "large commercial vehicle," the majority's analysis will certainly be applied to all vehicles in the near future. This is because the reasoning underlying this opinion is not that the death was caused because a large commercial vehicle was involved but because, as the majority states, [9]"driving on the wrong side of the road presents a substantial and unjustifiable risk that [a person] might hit a car traveling in the opposite direction and kill someone." Again, I must note, that criminal liability under the negligent homicide statute arises when under the circumstances the person should have been aware of the

risk and his or her failure to perceive it was a gross deviation from the care a reasonable, prudent person would exercise under the circumstances. *Hunter, supra.* There is no such proof in this case.

There is no question that the death of W.R. Purdue is a terrible tragedy, but the death of any person in a motor vehicle accident is a tragedy. The majority concludes that, "[a] person driving a garbage truck around a curve and on a bridge should be aware that driving on the wrong side of the road presents a substantial unjustifiable risk that he might hit a car traveling in the opposite direction and kill someone in that car." While Utley's alleged inattention may give rise to liability under the civil law, does it give rise to liability under the criminal law?

What happened to Utley? Did he doze off? Was he changing a CD or the radio? Did his mind wander? All of these acts are certainly acts of negligence, but are they acts of criminal negligence? Are they "a gross deviation from the standard of care that a reasonable person would observe in the actor's situation," as required by Ark.Code Ann. § 2–2–202(4) (Repl.1997)? It would appear not.

*Utley v. State,* 366 Ark. 514, 518–21, 237 S.W.3d 27, 30–32 (2006). Despite the cogent questions raised by the dissent in *Utley,* the majority opinion is clear and is not only instructive but conclusive in our case. Rollins's actions, predominantly his singular act of crossing the center line, amounted to negligence of a criminal degree.

■ Where the evidence presented is insufficient to sustain a conviction for a certain crime, but where there is sufficient evidence to sustain a conviction for a lesser-included offense of that crime, we may "reduce the punishment to the maximum for the lesser offense, reduce it to the minimum for the lesser offense, fix it . . . at some intermediate point, remand the case to the trial court for the assessment of the penalty, or grant a new trial either absolutely or conditionally." *Dixon v. State,* 260 Ark. 857, 862, 545 S.W.2d 606, 609 (1977). We, therefore, modify the judgments of conviction to the lesser-included offense of negligent homicide under Ark.Code Ann. § 5–10–105(b)(1) (Repl. 2006) and reduce each sentence to the maximum term of years for a Class A misdemeanor—one year—and the maximum allowable fine—$1,000. Ark.Code Ann. §§ 5–4–401(a)(5) and 5–4–201(b)(1) (Repl.2006).

Affirmed as modified.

GLOVER and MARSHALL, JJ., agree.